UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/4/2020

-------------------------------------------------------- X
                      :

UNITED STATES,                    :
                      :
                      :

      -v-                  :               1:19-cr-00641-GHW
                      :

CESAR ESPINOZA,          :      MEMORANDUM OPINION AND
                      :                 ORDER
              Defendant. :
-------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

     Defendant Cesar Espinoza entered the United States without authorization. Soon after he crossed the border, Mr. Espinoza was apprehended and deported. Quickly thereafter, Mr. Espinoza reentered the United States and was again apprehended and deported. Mr. Espinoza then reentered the country for a third time, was arrested, and currently faces prosecution for illegal reentry. Mr. Espinoza now moves to dismiss the indictment against him because his prior removal was fundamentally unfair. Mr. Espinoza argues that he had a right to be informed of his ability to request discretionary relief from removal, that he would have requested such relief if he was aware that it was available, and that there is a reasonable probability that he would have been granted such relief if he had requested it. Mr. Espinoza also argues that inconsistencies in the documentary record raise doubts about whether the immigration officials informed him of the nature of the proceedings, the charges against him, and his right to consular assistance. Because Mr. Espinoza did not have a right to be informed of his ability to request discretionary relief from removal and because there is not a sufficient causal connection between the other errors he alleges and the prejudice he claims, Mr. Espinoza's motion to dismiss the indictment is DENIED.

## I. BACKGROUND

Mr. Espinoza is a native and citizen of Mexico. Declaration of Cesar Espinoza-Zeferino ("Espinoza Decl."), Ex. A to Declaration of S. Isaac Wheeler in Support of Motion to Dismiss ("Wheeler Decl."), Dkt No. 18, ¶ 2. He first came to the United States in or about September 2014 with his uncle and father, who had arranged an illegal border crossing from Mexico by paying "coyotes," or smugglers. *Id.* ¶ 4. Shortly after his crossing, Mr. Espinoza was arrested with his uncle and father. *Id.* ¶¶ 5-6. The three were then transported to a Border Patrol Station in the vicinity of McAllen, Texas. Form I-213, Ex. B to Wheeler Decl., at USAO_000057.

The records created in connection with the removal proceedings describe what occurred after Mr. Espinoza was apprehended. As memorialized in a Form I-867A/B, Mr. Espinoza was interviewed by Fernando Cortez, a Border Patrol Agent. In response to Mr. Cortez's questions, Mr. Espinoza indicated that he (i) understood what was explained to him; (ii) did not have any questions; (iii) agreed to answer the Border Patrol Agent's questions; and (iv) swore that any statements he made would be true and complete. Form I-867A/B, Ex. C to Wheeler Decl. at USAO_000015. Mr. Espinoza signed this form and by doing so, he attested that he either read, or had read to him, his statement, that his answers were true and correct to the best of his knowledge, and that his statement was a "full, true and correct record." *Id.* at USAO_000017.

On the same form, Mr. Espinoza also attested that he was advised, in Spanish, of his "rights, and the purpose and consequences of [the] interview," including that he did "not appear to be admissible or to have the required legal papers authorizing [his] admission to the United States," which "may result in [his] being denied admission and immediately returned to [his] home country without a hearing." *Id.* at USAO_000015. The form also stated that Mr. Espinoza was advised that if he was refused admission, he would be "immediately removed from this country," and if he was removed, that he "may be barred from reentry for a period of 5 years or longer." *Id.* In addition, by

signing the form and initialing each page, Mr. Espinoza attested that he understood United States law "provides protection to certain persons who face persecution, harm or torture upon return to their home country," and that if he "fear[ed] or [had] a concern about being removed from the United States or about being sent home, [he] should tell [the Border Patrol Agent] during this interview because [he] may not have another chance." *Id.*

The I-867A/B also indicates that Mr. Espinoza, in response to questions posed in Spanish, provided his name, date and place of birth, and confirmed that he and his parents were citizens of Mexico and that they never had any legal claim to being United States citizens. *Id.* at USAO_000016. He admitted that he entered the United States illegally on or about September 4, 2014, and that he did not have any fear of persecution or torture upon returning to Mexico. *Id.* at USAO_000016-18.

Mr. Espinoza has submitted a sworn declaration that in many respects directly contradicts the contemporaneous documentary record from the time that he was apprehended. Mr. Espinoza claims that the officer questioning him did not read to him from any document or preface any of these questions with an explanation of Mr. Espinoza's legal status or the purpose of the questioning. Espinoza Decl. ¶ 10. This contradicts the documentary record established in the I-867A/B, which contains a statement that a Border Patrol Agent is supposed to read to a detained alien, including a statement that the agent would "explain [the alien's] rights, and the purposes and consequences of this interview." Form I-867A/B at USAO_000015. Although the I-867A/B begins with a lengthy recitation that identifies the officer's position, the reason for and potential consequences of the interview, and his rights under applicable law, this recitation is in English, which Mr. Espinoza did not understand. Espinoza Decl. ¶ 17.

Mr. Espinoza now attests that an officer questioned him in Spanish that was "sometimes difficult" for him "to understand." *Id.* ¶ 9. Mr. Espinoza states that the questioning officer did not

explain that a fear of being returned to Mexico might lead to his being allowed to remain in the United States or ask Mr. Espinoza or his father if they were willing to answer questions or if they wished to speak to an attorney. *Id.* ¶ 10; *cf.* Form I-867A/B at USAO_000015 ("If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance."). Rather, Mr. Espinoza claims that the officer simply began to ask questions, such as why and how he had come to the United States and details about the coyotes who had helped him cross the border. Espinoza Decl. ¶¶ 10-11.

Mr. Espinoza also attests that the I-867A/B did not accurately record his answers to questions posed by immigration officials. The I-867A/B records that Mr. Espinoza stated that his destination was McAllen, Texas. I-867A/B at USAO_000016; *see also id.* at USAO_000017 (stating that Mr. Espinoza told an immigration officer that he intended to live and work in McAllen, Texas). But Mr. Espinoza attests that, at the time, he did not know that McAllen, Texas existed. Espinoza Decl. ¶ 13. Rather, he attests that he had always planned to travel to New York City, where his father had previously lived and worked. *Id.* The form also states that Mr. Espinoza responded to the question "[h]ow did you enter into the United States?" with the answer "I crossed the river by swimming." I-867A/B at USAO_000016. However, Mr. Espinoza now attests that he did not swim from Mexico to the United States but rather traveled on an inflatable raft. Espinoza Decl. ¶ 12. Mr. Espinoza notes that his full name is given on the I-867A/B as "Cesar Espinoza-Seferino," which is a misspelling of his true maternal surname, Zeferino. Memorandum of Law in Support of Defendant's Motion to Dismiss the Indictment ("Mem."), Dkt No. 19, at 5; I-867A/B at USAO_000016. In addition, the initials on the pages of the I-867A/B are "CES," but Mr. Espinoza's initials are "CEZ." I-867A/B at USAO_000016-18. Mr. Espinoza attests that when an immigration officer "told [him] to put [his] initials in several places," Mr. Espinoza "was not sure

what he meant," so the immigration officer instructed him to "write the letters 'CES.'" Espinoza Decl. ¶ 17.

Mr. Espinoza also points to several other inconsistencies in the documentary record. The I-213 states that "[t]he process of this expedited removal was conducted via video conference[.]" I-213 at USAO_000058. Mr. Espinoza attests that he did not speak with an officer via video conference at any stage of the interview process. Espinoza Decl. ¶ 19. The I-213 also states that Border Patrol Agent Robert Originales conducted the proceeding. I-213 at USAO_000058. But, as noted above, the I-867A/B interview record states that it was prepared by Agent Fernando Cortez. I-867A/B at USAO_000015; *see also* Mem. at 9-14 (detailing other alleged inconsistencies).

Several days after his initial interview, Mr. Espinoza was removed from his cell and presented with papers purporting to record his interview as well as an order of removal and was asked to sign them. Espinoza Decl. ¶ 17. Mr. Espinoza did so but attests that he did not have an opportunity to read these forms or have them read to him. *Id.* Mr. Espinoza declares that he was not informed that he had a statutory right to withdraw his request for admission, and that he would have availed himself of that right if he had been aware of it. *Id.* ¶ 14.

On September 6, 2014, a Border Patrol Agent served a Notice and Order of Expedited Removal on the defendant, and he was removed from the United States on or about September 8, 2014. Determination of Inadmissibility and Order of Removal, Ex. D to Wheeler Decl.; Notice to Alien Ordered Removed/Departure Verification, Ex. E to Wheeler Decl.

After he was deported, Mr. Espinoza almost immediately returned to the United States. Mr. Espinoza's second entry was facilitated by the same group of coyotes who again smuggled him, his uncle, and his father across the border. Espinoza Decl. ¶¶ 21-22. He was again soon apprehended. *Id.* ¶ 21. The documentary record of his second interview with immigration officials states that after his apprehension on or about September 17, 2014, the defendant agreed to make a sworn statement

to a Border Patrol Agent regarding his smuggling arrangements and illegal entry. Form I-215B, Ex. G to Wheeler Decl., at USAO_000030. The log of this interview also states that he was provided Miranda warnings in the Spanish language, which the defendant signed along with a statement that stated, in Spanish: "I am willing to give statements and answer questions. At the moment I don't want to have a lawyer. I understand and I am aware of what I am doing. I have not been subject to promises, threats, pressure, or coercion of any kind." *Id.* (translated from Spanish). Mr. Espinoza again swore to truthfully answer questions and admitted that he had previously been removed. *Id.* at USAO_000031-32. He also stated that he had traveled with his uncle and father, who paid for their illegal border crossing together. *Id.* Mr. Espinoza again signed the statement and initialed each page. *Id.* at USAO_000030-33.

The next day, on or about September 18, 2014, Border Patrol officials issued a Notice of Intent/Decision to Reinstate Prior Order against Mr. Espinoza. Reinstatement Order, Ex. H to Wheeler Decl., at USAO_000010; *see also* Form I-215B at USAO_000020; . The Reinstatement Order refers to Mr. Espinoza's prior Expedited Removal on or about September 6, 2014 and states that he is removable as an alien who had illegally reentered the United States after having been previously removed. Reinstatement Order at USAO_000010. The Reinstatement Order also contains a signed certification by a Border Patrol Agent stating that "[t]he facts that formed the basis of this determination, and the existence of a right to make a written or oral statement contesting this determination, were communicated to the alien in the Spanish language." *Id.* Mr. Espinoza's signature appears on the "Acknowledgement and Response" section of the same form, dated September 18, 2014, and indicates that he did not wish to make a statement contesting the determination on the Reinstatement Order. *Id.* Mr. Espinoza again disputes that this or any other form was read to him but acknowledges that he signed the Reinstatement Order and signed and initialed the I-215B. Espinoza Decl. ¶ 22. Mr. Espinoza was removed a second time pursuant to

the reinstated September 6 order on October 30, 2014. Form I-213, Ex. F to Wheeler Decl., at USAO_000022.

At some point following Mr. Espinoza's second removal, he returned to the United States and was arrested by the New York City Police Department on or about May 19, 2019 for two counts of robbery. Complaint ("Compl."), Dkt No. 1, ¶ 4. Thereafter, a federal grand jury indicted Mr. Espinoza on one count of illegal reentry in violation of 8 U.S.C. § 1326(a) on September 3, 2019. Indictment, Dkt No. 7, at 1.

Mr. Espinoza now moves to dismiss the Indictment, pursuant to 8 U.S.C. § 1326(d), Federal Rule of Criminal Procedure 12, and the Fifth Amendment to the United States Constitution because his initial Expedited Removal in 2014 was fundamentally unfair. Mr. Espinoza submitted his motion on January 16, 2020. Dkt Nos. 17-19. The Government submitted an opposition on January 29, 2020. Memorandum in Opposition to Motion To Dismiss Indictment ("Opp."), Dkt No. 20. Mr. Espinoza submitted a reply on February 5, 2020. Reply Memorandum of Law in Support of Motion to Dismiss the Indictment ("Rep."), Dkt No. 21.

## II. LEGAL STANDARD

### A. Constitutional and Statutory Background

A noncitizen facing removal is entitled to due process of law. *Reno v. Flores*, 507 U.S. 292, 306 (1993); *see also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[O]nce an alien enters the country . . . the due process clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary or permanent."). Deportable noncitizens encountered by ICE are normally afforded the process to which they are due in proceedings in the immigration court system. *See generally* 8 C.F.R. Part 1003.

Congress has provided for an exception to the general rule that noncitizens should be processed through the immigration court system. Under the "expedited removal" process codified

at 8 U.S.C. § 1225(b)(1), noncitizens encountered within 100 miles of the border, who cannot establish that they have been present more than 14 days, and who are deemed to be inadmissible on the basis that they lack any valid document for entry, *see* 8 U.S.C. § 1182(a)(7)(A)(i), can be ordered removed by DHS itself, on an expedited basis and without seeing an immigration judge. *See* Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877-01 (2004).[1] The statute provides that an officer "shall order" a noncitizen subject to this procedure "removed from the United States without further hearing or review unless the [noncitizen] indicates either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i).

At issue in the current motion, the alien may also, "in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States." 8 U.S.C. § 1225(a)(4). The governing regulations emphasize the discretionary nature of this relief: "The alien's decision to withdraw his or her application for admission must be made voluntarily, but nothing in this section shall be construed as to give an alien the right to withdraw his or her application for admission." 8 C.F.R. § 1235.4. And while immigration officials are required to inform otherwise inadmissible aliens about the right to seek a credible fear determination—a step on the path to a claim for asylum—the regulations do not require that immigrants be informed of the possibility that the Attorney General, in his discretion, might permit the immigrant to withdraw his application for admission. *See id.* § 1235.3.

---

[1] "When an immigration official determines an alien will be subject to expedited removal, he takes a sworn statement from the alien using Form I-867." *United States v. Gonzalez-Fierro*, 949 F.3d 512, 525 (10th Cir. 2020) (Tymkovich, C.J., concurring in the judgment) (citing 8 C.F.R. § 235.3(b)(2)(i)). "According to this form, the statement's purpose is to determine the alien's admissibility: 'If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, you may be barred from reentry for a period of 5 years or longer.' The form describes the procedure for raising a claim of asylum or fear of persecution." *Id.* (citation omitted). "The immigration officer records the alien's answers to questions about identity, alienage, and admissibility on the form; reads the statement to the alien; and instructs the alien to sign each page of the statement." *Id.* (citing 8 C.F.R. § 235.3(b)(2)(i)). "The officer then reads the charges of inadmissibility and gives the alien an opportunity to respond in the sworn statement. If immigration officials determine the alien should be removed, they serve the alien with Form I-860—the Notice and Order of Expedited Removal." *Id.* "Unless the alien claims asylum, voices fear of persecution, or claims to be a lawful permanent resident, refugee, asylee, or U.S. citizen, he is not entitled to a hearing or appeal." *Id.* (citing 8 U.S.C. § 1225(b)(1)(A), (b)(1)(C); 8 C.F.R. § 235.3(b)(2)(ii)).

**B. Section 1326(d)**

"The dismissal of an indictment is an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." *United States v. Bustos De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (citation omitted). For the Government to prove a defendant guilty of illegal reentry after deportation, it must prove that the defendant has previously been deported, among other elements. *See* 8 U.S.C. § 1326(a)(1)-(2). In *United States v. Mendoza-Lopez*, the Supreme Court held that an illegal reentry prosecution cannot rest upon a prior deportation order that was obtained in violation of the noncitizen's rights and without a meaningful opportunity for redress or judicial review. 481 U.S. 828, 839 (1987) (holding that "a collateral challenge to the use of a deportation proceeding as an element of a criminal offense must be permitted where the deportation proceeding effectively eliminates the right of the alien to obtain judicial review").

Congress codified the holding of *Mendoza-Lopez* at 8 U.S.C. § 1326(d) ("Section 1326(d)"). *See United States v. Lopez*, 445 F.3d 90, 94 (2d Cir. 2006). Thus, pursuant to Section 1326(d), a defendant may collaterally attack any deportation upon which her illegal reentry charge is based if the defendant carries her burden of establishing that: "(1) [he] exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived the [defendant] of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair." 8 U.S.C. § 1326(d). These "requirements are conjunctive, and thus [a defendant] must establish all three in order to succeed in his challenge to his removal order." *United States v. Fernandez-Antonia*, 278 F.3d 150, 157 (2d Cir. 2002). The parties agree that Mr. Espinoza has satisfied the first two requirements under Section 1326(d); therefore, this motion focuses on whether Mr. Espinoza's prior deportation order was fundamentally unfair.

To show fundamental unfairness under Section 1326(d)(3), a defendant "must show both a

fundamental procedural error and prejudice resulting from that error." *Id.* at 159. Prejudice requires a defendant to show that "absent the procedural errors, he would not have been removed." *Id.*; *see also United States v. Fares*, 978 F.2d 52, 57 (2d Cir. 1992) (holding that if "a fully informed exercise of the right of direct appeal would have yielded the alien no relief from deportation, the deportation order may be used to establish conclusively an element of a criminal offense"); *United States v. Copeland*, 376 F.3d 61, 73 (2d Cir. 2004) ("Prejudice is shown where defects in the deportation proceedings may well have resulted in a deportation that would not otherwise have occurred.") (quotation omitted).

The Second Circuit has explained that the test for prejudice is akin to that used for ineffective assistance of counsel claims, requiring a "reasonable probability that, but for [the] . . . errors, the result of the proceeding would have been different." *Id.* at 73 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)); *see also Lopez*, 445 F.3d at 100 (defining a "reasonable probability" as a "probability sufficient to undermine confidence in the outcome"). "A reasonable probability has been . . . quantified as a twenty percent probability that relief would have been granted absent the error." *United States v. Brown*, 354 F. Supp. 3d 362, 371 (S.D.N.Y. 2018) (citing *United States v. Copeland*, 369 F. Supp. 2d 275, 288 (E.D.N.Y. 2005)). "The alien bears the burden of showing that entry of the removal order was fundamentally unfair." *United States v. Daley*, 702 F.3d 96, 100 (2d Cir. 2012).

## III. DISCUSSION

### A. An Alien Has No Right To Be Informed of His Ability To Request Discretionary Relief from Removal.

Mr. Espinoza has met the requirements that he exhaust his administrative remedies and show that he was deprived of an opportunity for judicial review. He has met the first requirement because "a[n expedited] removal order . . . is not subject to administrative appeal[.]" 8 U.S.C. § 1225(b)(1)(C); *see also* 8 C.F.R. § 235.3(b)(2)(ii) ("Except as otherwise provided in this section, such

alien is not entitled to a hearing before an immigration judge in proceedings conducted pursuant to

section 240 of the Act, or to an appeal of the expedited removal order to the Board of Immigration

Appeals.").  Although there are exceptions, neither party argues they are applicable here.  Mr.

Espinoza has met the second requirement because where the expedited removal statute applies, "the

officer shall order the alien removed from the United States without further hearing or review."

8 U.S.C. § 1225(b)(1)(A)(i).  The government does not contest that Mr. Espinoza has met either

requirement in this case.  *See* Opp. at 26 (conceding that "[t]hese requirements are generally not in

dispute" in cases arising under 8 U.S.C. § 1225(b)(1)(A)(i)).[2]

---

[2] The Court does not decide whether 8 U.S.C. § 1225(b)(1)(D)—pursuant to which a reviewing court "shall not have jurisdiction to hear any claim attacking the validity of an order of removal entered under" § 1225(b)(1)(A)(i)—or 8 U.S.C. § 1252(a)(2)(A)(i), under which "no court shall have jurisdiction to review . . . any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1)," are unconstitutional as applied in this case.  "In order to streamline th[e expedited] removal process, an expedited order of removal is generally not subject to an administrative appeal or judicial review." *Gonzalez-Fierro*, 949 F.3d at 518-19 (majority op.) (quoting *United States v. Barajas-Alvarado*, 655 F.3d 1077, 1081-82 (9th Cir. 2011) and citing 8 U.S.C. § 1225(b)(1)(C), *id.* § 1252(a)(1), (a)(2)(A), (e)).  Three circuits have found § 1225(b)(1)(D) unconstitutional as applied in circumstances like those presented in this case because it conflicts with the Supreme Court's holding in *Mendoza-Lopez*, 481 U.S. at 839, that "[d]epriving an alien of the right to have the disposition in a deportation hearing reviewed in a judicial forum requires, at a minimum, that review be made available in any subsequent proceeding in which the result of the deportation proceeding is used to establish an element of a criminal offense."  *See Barajas-Alvarado*, 655 F.3d at 1087; *Gonzalez-Fierro*, 949 F.3d at 516-520; *United States v. Villareal Silva*, 931 F.3d 330, 337 (4th Cir. 2019).  The Second Circuit has not addressed whether this provision can withstand constitutional scrutiny as applied to illegal reentry prosecutions.

The Court does not decide whether § 1225(b)(1)(D) is unconstitutional in this context because it agrees with the Fifth Circuit's holding that "section 1225(b)(1)(D) does not preclude the district court or [an appellate court] from determining that the requisites of a *Mendoza-Lopez* claim as asserted by [a defendant] are *not* met."  *United States v. Lopez-Vasquez*, 227 F.3d 476, 486 (5th Cir. 2000).  Like the *Lopez-Vaquez* court, the Court does "not determine whether section 1225(b)(1)(D) precludes a district court from dismissing a section 1326 prosecution on the basis that the defendant has properly established a valid *Mendoza-Lopez* claim respecting the prior removal or deportation or whether, if section 1225(b)(1)(D) has that effect, it is unconstitutional."  *Id.* (emphasis omitted); *see also United States v. Vasquez-Vasquez*, No. 19-CR-00381-PAB, 2020 WL 93841, at *3 (D. Colo. Jan. 8, 2020) ("The Court finds that it need not rule on the constitutionality of 8 U.S.C. § 1225(b)(1)(D) because, even if defendant may collaterally attack his deportation order, he cannot succeed on the merits of his motion."); *United States v. Parker*, No. 1:08-CR-98, 2009 WL 311871, at *3 (D. Vt. Feb. 6, 2009) ("Therefore, the Court declines to decide whether § 1225(b)(1)(D) would preclude Parker from collaterally attacking his removal.") (citations omitted); *United States v. Guzman-Garfias*, No. CR-10-0306-TUC-DTF, 2010 WL 5139495, at *3 (D. Ariz. Sept. 27, 2010), *report and recommendation adopted*, 2010 WL 5093938 (D. Ariz. Dec. 8, 2010) ("Because the Court concludes that Defendant's expedited removal proceeding did not violate his due process rights and was not fundamentally unfair, the Court does not reach the jurisdictional question under § 1225(b)(1)(D).") (citations omitted); *United States v. Martinez-Zavala*, No. 09CR1774 BTM, 2009 WL 2485751, at *7 (S.D. Cal. Aug. 11, 2009) ("Nonetheless, even if the Court were to find that the expedited removal proceeding here violated Martinez-Zavala's procedural due process rights, he has not adequately demonstrated prejudice as a result of the alleged violation. Therefore, the Court does not reach the question of whether it properly has jurisdiction to consider the defendant's Section 1326(d) attack on his removal order in spite of Section 1225(b)(1)(D).") (citation omitted); *United States v. Lopez-*

Mr. Espinoza cannot meet the third requirement under Section 1326(d), however, because the entry of his removal order was not fundamentally unfair. To show that his removal order was "fundamentally unfair," Mr. Espinoza must demonstrate "both a fundamental procedural error and prejudice resulting from the error." *Lopez*, 445 F.3d at 100 (quotation omitted). Mr. Espinoza claims prejudice because he was unaware of his ability to request discretionary relief from removal. Mr. Espinoza's argument is that if he had been aware of his ability to make this request, he would have done so, and that it is reasonably probable that he would have been granted such relief had he done so. Mem. at 27.

Mr. Espinoza argues that his deportation proceeding was subject to fundamental procedural error because he was "not made aware of his statutory right to request discretionary relief from removal." Mem. at 25. In other words, Mr. Espinoza claims a right to be informed of his right to request discretionary relief from removal. If he were correct that this was a fundamental procedural error, there would be a substantial question as to whether he had sufficiently demonstrated prejudice resulting from the fundamental procedural error.

The Court need not decide whether Mr. Espinoza has in fact demonstrated prejudice because he did not have a right to be informed of his right to request discretionary relief from removal. No statute or regulation affords Mr. Espinoza this supposed right. In fact, the applicable

---

*Garcia*, No. 09CR1118 WQH, 2009 WL 3244702, at *3 (S.D. Cal. Oct. 6, 2009), *aff'd*, 449 F. App'x 587 (9th Cir. 2011) (reaching the same conclusion). The Court observes that the Government does not argue that § 1225(b)(1)(D) deprives it of jurisdiction to decide the instant motion. *See* Opp. at 27 (arguing that "there is no reason for the Court to" address whether "Section 1225(b)(1)(D) is unconstitutional as applied to illegal reentry prosecutions" because "the defendant cannot carry his burden of demonstrating that his underlying removals were fundamentally unfair.").

The Court's decision is consistent with the principle that it is "important to avoid the premature adjudication of constitutional questions" and that courts "ought not to pass on questions of constitutionality unless such adjudication is unavoidable." *Matal v. Tam*, 137 S. Ct. 1744, 1755 (2017) (quotation and alterations omitted); *see also Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) (observing that courts should "not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of"). It is also consistent with the "cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more." *Penn v. New York Methodist Hosp.*, 884 F.3d 416, 426 n.5 (2d Cir. 2018) (quoting *PDK Labs. Inc. v. Drug Enforcement Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in judgment)).

regulations explain that "nothing in this section shall be construed as to give an alien the right to withdraw his or her application for admission." 8 C.F.R. § 1235.4. Moreover, the Board of Immigration Appeals has specifically rejected the argument that an immigration judge ("IJ") is required to "advise an alien of the ability to seek withdrawal of an application for admission since this form of 'relief' ordinarily requires the concurrence of the Department of Homeland Security[.]" *In re: Martin Escobar*, 2006 WL 3485709, at *2 (BIA Oct. 13, 2006) (unpublished). If an IJ is not required to inform an alien of his ability to seek withdrawal, there is no logical reason to infer a requirement that a Border Patrol Agent is so obligated. *See United States v. Sanchez-Lopez*, 414 F. Supp. 3d 842, 846 (E.D. Va. 2019) ("[T]he Defendant has not pointed to any regulation, statute, or case of this circuit or its district courts that requires the immigration officer to advise an alien of the possibility of discretionary relief[.]"); *cf. United States v. Gonzalez-Sanchez*, No. 2:19-CR-342, 2020 WL 805951, at *7 (D. Utah Feb. 18, 2020) ("[T]his court holds that an alien in expedited removal proceedings has no constitutional right to be informed of discretionary relief from deportation."). Hence, Mr. Espinoza did not have a right to request discretionary relief from removal.

Mr. Espinoza's arguments to the contrary are unpersuasive. Mr. Espinoza relies heavily on *United States v. Copeland*, 376 F. 3d 61 (2d Cir. 2004). In that case, the Second Circuit addressed a form of discretionary relief then available under section 212(c) of the Immigration and Nationality Act ("INA"). *See id.* at 64-65. The defendant's argument rested on 8 C.F.R. § 242.17, which at that time stated that "[t]he immigration judge shall inform the respondent of his or her apparent eligibility to apply for any of the benefits enumerated in this paragraph and shall afford the respondent an opportunity to make application therefor during the hearing." 8 C.F.R. § 242.17(a) (1995). The *Copeland* court held that the "denial of an established right to be informed of the possibility of such relief" was a fundamental procedural error. *Copeland*, 376 F.3d at 72. As Mr. Espinoza notes, the ultimate relief in question in *Copeland*—a waiver under section § 212(c)—was

purely discretionary. *Id.* at 70-71. Thus, Mr. Espinoza here argues that although the relief from removal he requested was discretionary, he had a right to request such relief and to be notified of the existence of that right.

   *Copeland* provides some support for Mr. Espinoza's position but does not ultimately tip the scales in his favor. As explained in a subsequent district court decision, the *Copeland* court "gave several reasons for its conclusion," two of which are important in this context. *United States v. Gonzalez*, No. 15-CR-0021 JMF, 2015 WL 3443942, at *6 (S.D.N.Y. May 29, 2015). Weighing in Mr. Espinoza's favor, one reason given by the *Copeland* court was that "deportation 'usually has very serious consequences' and that, for many aliens, Section 212(c) was 'the only available avenue of relief.'" *Id.* (quoting *Copeland* 376 F.3d at 72-73).[3] The same reasoning applies here; Mr. Espinoza faced deportation and discretionary relief was likely his only plausible avenue of relief.[4]

   However, weighing against Mr. Espinoza's position, the *Copeland* court also noted that "although an immigration judge ultimately has discretion over whether to grant Section 212(c) relief,

---

[3] Mr. Espinoza also argues that *Copeland*'s holding that "[relief e]ligibility that was governed by specific statutory standards provided a right to a ruling on an applicant's eligibility, even though the actual granting of relief was not a matter of right under any circumstances, but rather is in all cases a matter of grace," *Copeland*, 376 F.3d at 72 (quoting *I.N.S. v. St. Cyr*, 533 U.S. 289, 307-08 (2001)), supports his position because the *Copeland* court "found that a noncitizen removed in ignorance of his statutory eligibility for 212(c) suffered fundamental unfairness, because the statute created such relief, for which a right to apply attached." Rep. at 5 (emphasis and citation omitted). Mr. Espinoza's interpretation of *Copeland*'s quotation of *St. Cyr* is unpersuasive. In this passage, the *Copeland* court was supporting its interpretation that the issue in that case was "not whether Section 212(c) relief is constitutionally mandated, but whether a denial of an *established right* to be informed of the possibility of such relief can, if prejudicial, be a fundamental procedural error." *Copeland*, 376 F.3d at 72 (emphasis added). Here, there is no such established right, so this passage does not support Mr. Espinoza's arguments.

Likewise, Mr. Espinoza's argument that "the fundamental unfairness [in *Copeland*] arose not from the failure to follow this regulation but from the violation of 'a fundamental right derived from a federal statute,' i.e., section 212(c) itself," Rep. at 5 (quoting *Copeland*, 376 F.3d at 72), is unpersuasive. The *Copeland* court stated that "*[w]hen a regulation is promulgated* to protect a fundamental right derived from a federal statute, and the INS fails to adhere to it, the challenged deportation proceeding is invalid." *Copeland*, 376 F.3d at 72 (quoting *Waldron v. INS*, 17 F.3d 511, 518 (2d Cir. 1994)) (emphasis added). Here, no regulation has been promulgated establishing Mr. Espinoza's right to be notified of his right to request discretionary relief, so there is no "fundamental right derived from a federal statute" at issue. *Copeland*, 376 F.3d at 72 (quotation omitted).

[4] The Court observes that an interpretation of what constitutes a "fundamental procedural error" resting exclusively on the harsh consequences of deportation obviates the requirement that an error be "fundamental" because it implies that *any* error with respect to a deportation renders the deportation fundamentally unfair.

14

he or she has no discretion over whether to hold a hearing if requested. 'In fact, under applicable regulations,' the [*Copeland*] Court noted, an immigration judge 'must both inform an eligible alien of his or her right to a Section 212(c) hearing, and thereafter hold such a hearing, if requested.'" *Id.* (quoting *Copeland*, 376 F.3d at 72); *see also Copeland*, 376 F.3d at 72 ("[T]he right to a Section 212(c) hearing is well established and mandatory, whether or not the ultimate granting of relief is discretionary.").[5] Here, in contrast to *Copeland*, there was no "well established and mandatory" right for Mr. Espinoza to be informed about his right to request discretionary relief.[6]

The lack of a regulation or other authority requiring an immigration officer to inform aliens of their right to request discretionary relief under § 1225(b)(1) distinguishes this case from *Copeland*. Most persuasive for the Court's analysis is the Ninth Circuit's decision in *United States v. Sanchez-Aguilar*, 719 F.3d 1108 (9th Cir. 2013). In that case, the defendant argued that "his due process rights were violated because the immigration officer who interviewed him at the border did not tell him that he could request withdrawal of his application for admission, a form of discretionary relief which, if granted, would have allowed Sanchez–Aguilar to leave the United States immediately without a removal order being entered." *Id.* at 1110-11 (citing 8 U.S.C. § 1225(a)(4); 8 C.F.R. § 235.4). The Ninth Circuit noted that "[i]n the context of removal proceedings for aliens who have already been admitted into the United States, we have held that due process requires the immigration

---

[5] Another reason given by the *Copeland* court was that "an immigration judge, 'unlike an Article III judge, is not merely the fact finder and adjudicator but also has an obligation to establish the record,' especially (although not only) in *pro se* cases." *Gonzalez*, 2015 WL 3443942, at *6 (quoting *Copeland*, 376 F.3d at 71). That was because the defendant in that case had been affirmatively misinformed about his legal options and "our removal system relies on IJs to explain the law accurately to *pro se* aliens." *Copeland*, 376 F.3d at 71. Mr. Espinoza was not affirmatively misinformed about the law in this case. Moreover, the question of whether Mr. Espinoza had a right to be informed about the law regarding his ability to request discretionary relief is the central question presented here. Hence, the Court concludes that this reason does not weigh in favor of either argument in this case.

[6] For the same reason, the cases cited by Mr. Espinoza that have held that "an immigration judge's failure to advise an alien that he is eligible to apply for voluntary departure relief under 8 U.S.C. § 1229(b) is a fundamental procedural error" are inapposite. *See* Mem. at 26 (citing, *inter alia*, *United States v. Guzman*, No. 18 Cr. 216 (GHW), 2018 WL 3443158, at *4). The Board of Immigration Appeals has held that "if an alien is apparently eligible for voluntary departure, the [IJ] *must* inform him about its availability and give the alien an opportunity to apply." *Gonzalez*, 2015 WL 3443942, at *2 (citing *In re Cordova*, 22 I & N Dec. 966, 970-71 (BIA 1999)) (emphasis added). There is no analogous right under § 1225(b)(1).

judge to inform such aliens of potentially available avenues of relief." *Id.* at 1111 (citation omitted). However, like Mr. Espinoza, the defendant's "removal order was the product of an expedited removal proceeding authorized under 8 U.S.C. § 1225(b)(1)." *Id.* The *Sanchez-Aguilar* court noted that "such proceedings are generally reserved for 'arriving aliens' who, like" the defendant in that case and Mr. Espinoza here "are seeking admission into the United States at the border." *Id.* (citing 8 U.S.C. § 1225(b)(1)(A)(i); 8 C.F.R. § 235.3(b)(1)(i)).

The Ninth Circuit rejected the defendant's argument because "[t]he statute and regulation governing expedited removal proceedings, 8 U.S.C. § 1225(b)(1) and 8 C.F.R. § 235.3, set forth the procedural rights to which such aliens are entitled, but the right to be informed of potentially available avenues of relief from removal is not among them." *Id.* Consequently, "the immigration officer's failure to inform [the defendant] of his ability to request withdrawal of his application for admission did not violate his due process rights." *Id.* (citing *United States v. Lopez-Vasquez*, 227 F.3d 476, 479-80, 484-85 (5th Cir. 2000)).[7] Notably, although the government placed heavy emphasis on *Sanchez-Aguilar* in its opposition, *see* Opp. at 15, Mr. Espinoza did not attempt to explain why its reasoning was not persuasive in his reply.[8] Thus, the Court is persuaded to adopt the *Sanchez-Aguilar*

---

[7] *See also United States v. Meraz-Olivera*, 472 F. App'x 610, 611-12 (9th Cir. 2012) ("Meraz-Olivera was not denied due process by the immigration officer's failure to inform him that he had the right to withdraw the application for admission 'in the discretion of the Attorney General.' The Supreme Court has ruled that when Congress enacts a procedure, aliens are entitled to it. Here, Meraz-Olivera received all of the process required under 8 U.S.C. § 1225(b)(1)(A)(i). Neither the statute, nor the regulations, require that an immigration officer advise the alien of his opportunity to request withdrawal of his application for admission, subject to the Attorney General's discretion. (quoting 8 U.S.C. § 1225(a)(4) and citing 8 U.S.C. § 1225(b)(1)(A)(i) and 8 C.F.R. § 235.3; other quotation and brackets omitted); *United States v. Flores Garcia*, 764 F. App'x 643, 644 (9th Cir. 2019) ("[W]e have held that 'the right to be informed of potentially available avenues of relief from removal is not among' the procedural rights to which non-admitted aliens are entitled.") (quoting Sanchez-Aguilar, 719 F.3d at 1112 (9th Cir. 2013)); *cf. Sanchez-Lopez*, 414 F. Supp. 3d at 846 ("[T]he Defendant has not pointed to any regulation, statute, or case of this circuit or its district courts that requires the immigration officer to advise an alien of the possibility of discretionary relief, a fact that distinguishes his case from any cases where the court found that there was a due process right to notification of discretionary relief from removal because the immigration officer was required to provide such notification.") (citation omitted); *id.* at 846 n.3 (noting that *Copeland* is distinguishable from the facts arising in that case because *Copeland* "involved a form of relief, under section 212(c) of the Immigration and Nationality Act, that the immigration officer was required to inform the alien of" and "[t]hat form of relief is not available to the Defendant, and the regulation he points to as governing his proceeding, 8 C.F.R. § 235.3, does not mention an analogous duty of the immigration officer to inform the alien of potential relief.").
[8] The Government also cites cases in other circuits that have held that a defendant does not have a right to be informed

court's holding that aliens do not have a right to be informed that they can request discretionary relief from removal.

Mr. Espinoza also argues that the text of 8 U.S.C. § 1225(b)(4) grants him a right to request discretionary relief. That provision states that "[a]n alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States." 8 U.S.C. § 1225(a)(4). This provision says nothing about the right of an alien to be informed about the Attorney General's ability to exercise her discretion. The statute neither states nor implies that an alien must be informed of his ability to request relief. This is logical, given that the statute provides an alien no right to withdraw his application; that relief can only be granted by the Attorney General, or his delegees, in his discretion.

Mr. Espinoza also relies heavily on *United States v. Raya-Vaca*, 771 F.3d 1195 (9th Cir. 2014). But in that case, the Ninth Circuit expressly declined to address the defendant's argument that he was "constitutionally entitled . . . to be advised of potential relief[.]" *Id.* at 1206 n.9. Consequently, *Raya-Vaca* is of little persuasive value for the Court's analysis here. In his reply brief, Mr. Espinoza also points to *United States v. Perez*, 330 F.3d 97 (2d Cir. 2003), but that case is not on point. There, the defendant showed that "he had been deprived of effective assistance of counsel (i.e., that a fundamental procedural error had occurred)[.]" *Id.* at 104. Here, there has been no such showing. Thus, *Perez* does not suggest the conclusion that the failure to advise him of his ability to request discretionary relief was a fundamental procedural error. Accordingly, the Court concludes that the

---

of his ability to request discretionary removal. *See* Opp. at 14 (collecting cases). Those cases are less persuasive than *Sanchez-Aguilar* because, as the Government concedes, *Copeland*'s holding that "an IJ's failure properly to inform an alien facing removal of his right to seek discretionary relief may be fundamentally unfair" conflicts with holdings in most other circuits. *Copeland*, 376 F.3d at 71; *see Sanchez-Lopez*, 414 F. Supp. 3d 842, 846 n.3 (E.D. Va. 2019) ("Representing a minority view, the Second and Ninth Circuits have held that a failure to notify an alien of his eligibility for relief from removal can be 'fundamentally unfair' under 8 U.S.C. § 1326(d)(3).") (citing, *inter alia*, *Copeland*, 376 F.3d at 71). For that reason, cases from other circuits addressing this question are less persuasive than is the Ninth Circuit's view expressed in *Sanchez-Aguilar*.

failure to advise Mr. Espinoza of his right to request discretionary relief was not a fundamental procedural error.

### B. Other Alleged Fundamental Procedural Errors

Mr. Espinoza also points to other alleged fundamental procedural errors. Mr. Espinoza claims that (i) he was not read the prefatory explanation of rights on the I-867A/B; (ii) he was not advised of the charges against him on the Form I-860; (iii) the Border Patrol Officer did not read back the answers Mr. Espinoza gave, as memorialized on the Form I-867A/B, and (iv) that it is "doubtful" that he was advised of his right to consular notification. *See* Mem. at 22-23. These errors, according to Mr. Espinoza, are violations of 8 C.F.R. § 235.3(b)(2)(i), which require an examining immigration officer to "create a record of the facts of the case and statements made by the alien." 8 C.F.R. § 253.3(b)(2)(i).[9] The Government disputes that these alleged fundamental procedural errors occurred because they are contradicted by the documentary record of Mr. Espinoza's immigration proceeding. *See* Opp. at 20.

Even assuming that these alleged violations occurred and that they amount to fundamental procedural error (which the Court need not and does not decide),[10] Mr. Espinoza cannot

---

[9] *See also id.* ("The examining immigration officer shall read (or have read) to the alien all information contained on Form I-867A. Following questioning and recording of the alien's statement regarding identity, alienage, and inadmissibility, the examining immigration officer shall record the alien's response to the questions contained on Form I-867B, and have the alien read (or have read to him or her) the statement, and the alien shall sign and initial each page of the statement and each correction. The examining immigration officer shall advise the alien of the charges against him or her on Form I-860, Notice and Order of Expedited Removal, and the alien shall be given an opportunity to respond to those charges in the sworn statement. After obtaining supervisory concurrence in accordance with paragraph (b)(7) of this section, the examining immigration official shall serve the alien with Form I-860 and the alien shall sign the reverse of the form acknowledging receipt. Interpretative assistance shall be used if necessary to communicate with the alien.").

[10] Espinoza has submitted an affidavit in support of his motion. Several of the statements contained in Espinoza's affidavit contradict his own prior sworn statements. The Government characterizes that affidavit as "self-serving." Opp. at 7. The Court makes no finding regarding the truthfulness of Espinoza's sworn statements in his affidavit, and does not take a position regarding whether the documents that he signed at the time of his initial removal from the United States are entitled to a presumption of regularity, as the Government argues. *Id.* But it bears emphasis it would be a substantial burden on the court's and the parties' resources to require an evidentiary hearing whenever an factual issue regarding the deportation process is identified by a defendant alien (or, as here, is created *post hoc* by affidavit)— regardless of whether the issue was material, and whether it related to an error that plausibly prejudiced him. This case underscores the need for the reviewing court to scrutinize whether a defendant has shown a causal link between any asserted errors in his prior immigration proceeding and the prejudice that he allegedly suffered.

demonstrate that the prejudice he allegedly suffered—his inability to request discretionary relief from removal—resulted from the violations. Mr. Espinoza must demonstrate that the prejudice he claims resulted from the fundamental procedural errors he alleges. *Cf. Sanchez-Lopez*, 414 F. Supp. 3d at 846 ("Even assuming that the above two errors constituted due process violations, these errors were not causally linked to the prejudice the Defendant claims . . . Therefore, the alleged prejudice did not occur 'as a result of the defects.'") (citations omitted); *United States v. Terrazas Siles*, 397 F. Supp. 3d 812, 823 (E.D. Va. 2019) (noting "the fundamental disconnect between the defects defendant identifies and the harm she claims to have suffered" because "[n]one of the immigration forms that defendant claims were not translated for, or provided to, her contains any advisement about withdrawing an application for admission or the effect of departing the country without a formal removal order.").

As noted above, Mr. Espinoza claims prejudice because he was unaware of his ability to request discretionary relief removal, that if he had been aware of his ability to make such a request, he would have done so, and it is reasonably probable that he would have been granted such relief. Mem. at 27.

None of the procedural errors alleged by Mr. Espinoza is causally connected to the prejudice he alleges. Mr. Espinoza does not claim that the explanation of his rights on the I-867A included a reference to his ability to request discretionary relief. Nor does the I-860 contain any such explanation. *See Sanchez-Lopez*, 414 F. Supp. 3d at 846 ("Nothing in Form I-860 refers to the possibility of discretionary relief from removal, or an alien's ability to request it."). It does not make sense that an officer reading back Mr. Espinoza's answers would have alerted him to the possibility of his ability to request discretionary removal.

And even assuming that Mr. Espinoza was not advised of his right to consular notification,[11] there is not a "reasonable probability" that Mr. Espinoza would in fact have contacted the Mexican consulate if he was advised of his right to consular notification, that consular officials would have advised him of his right to discretionary relief, that he would have acted on the information supplied by the consular officials to request discretionary relief, and that he would have been granted such relief in the three days between when he was first apprehended by immigration officials and removed pursuant to the Removal Order. Indeed, according to a memorandum issued on January 11, 2012, the policy of the Rio Grande Valley Sector of the border in effect when Mr. Espinoza was apprehended "emphasize[d] that Voluntary Return is the least preferred/least effective consequence for most classifications," further undercutting the likelihood that Mr. Espinoza would have been granted discretionary relief from removal if he had requested it. Ex. A to Opp., Dkt No. 20-1, at 2. Hence, there is not a reasonable probability that Mr. Espinoza would have received discretionary relief from removal, even if he had been advised of his right to consular notification.

In his reply, Mr. Espinoza argues that "these failures deprived him, as a pro se noncitizen only months into adulthood, of even a basic awareness of what was going on, which could have led him to request relief from being removed." Rep. at 6. The Court disagrees with the loose suggestion that a greater awareness of "what was going on" may have led Mr. Espinoza to specifically request discretionary relief from removal. As noted above, Mr. Espinoza would not have been informed of his ability to request discretionary relief from removal even absent the alleged errors he identifies. Accordingly, Mr. Espinoza cannot show prejudice resulting from these alleged procedural defects.

---

[11] The Court notes that, in addition to being contradicted by the documentary record in this case, *see, e.g.*, Form I-213 at USAO_000058, Mr. Espinoza claims only that it is "doubtful" that he was advised of his right to consular notification, Mem. at 23, implicitly conceding that he may have been so advised.

**IV. CONCLUSION**

Mr. Espinoza has failed to show that his prior removal order was fundamentally unfair.  He did not have a right to be informed of his ability to request discretionary relief from removal, so the failure to inform him of this possibility was not a fundamental procedural error.  And even assuming that the other alleged procedural errors Mr. Espinoza identifies occurred and were fundamental, he cannot show prejudice that is causally connected to these alleged errors.  Accordingly, Mr. Espinoza's motion to dismiss his indictment is DENIED.

The Clerk of Court is directed to terminate the motion pending at Dkt No. 17.

SO ORDERED.

Dated: March 4, 2020
      New York, New York

                                     _____
                                      GREGORY H. WOODS
                                  United States District Judge